I'm sure counsel in the Dreher case are very disturbed that it appears that 5 minutes have been taken away from them. I don't know how that happened, and I'm sure you have 20 minutes of prepared remarks that you would be left bereft if you could not give us. We are very easy with a clock, this particular panel, so I don't know how that happened. But feel free to take 20 minutes, and we may have even a few more questions for you. Mr. Runke. Good morning. May it please the court. I'd like to start off by reserving 3 minutes of rebuttal time. Go ahead. Mr. Runke, on behalf of John Dreher. This is a case that was all about credibility on some levels, and most especially about time of death in a murder case. It was a case where if the state's theory was true, and an appellate John Dreher committed this murder, it would have had to have happened within an extraordinarily small time frame. Mr. Runke. Yes. Let me ask you if I could to answer a question about the cause and prejudice that Judge Debevoise found existed and excused the procedural default, which this court implied might have existed when it sent the case back in 2003. Great. Judge Debevoise says, in effect, if I'm reading this opinion right, from 2006, that there was a patent switch by the state of New Jersey. They said, we waive. This court said, well, maybe that's not a waiver. The state said, yes, golly, I guess that is a waiver. And then it got sent back to the state court. When it was back there, I understood the state's ruling to be that as a matter of state law, state evidentiary law in New Jersey, a ruling had been made. And, indeed, the case had been presented, the Dr. Tucker issue, which I understand you have been leading up to there, the vitreous potassium level issue, had been presented as a matter of state law. That is, this is an expert, and they ought to have this expert testimony admitted. Don't worry, there's a question in here somewhere. So, here is that question. What does the state's later decision to change its mind about waiving any procedural default, or whether there was exhaustion, I apologize, their decision to say, well, exhaustion existed, have to do with Mr. Dreher's trial counsel's decision to attack this on state grounds, and the state court's decision to address it on state evidentiary grounds? Okay. There's a lot in the question. I mean, the background is that this Habeas Corpus action was originally filed in 1998. It was, at that point, approximately three years since the date of conviction. New Jersey has a post-conviction rule that bars state post-conviction filings that occur later than five years after the date of conviction. There's no tolling, it's just the date of conviction is what gets measured by. In response to the Habeas petition, the state conceded exhaustion of remedies as to all issues except one, as to that one issue, the issue was withdrawn in light of the state's position. We then proceeded to litigate the case. The decision by Judge Del Boise was reached in 2001, by which time we were already past the five-year period of time when state post-conviction could have been commenced. The case came before this court. It was argued, I believe, in 2002, and nearly a year went by before the decision was rendered in 2003. In the time since the briefs were filed and the first oral argument, the court's response to it, I think it actually occurred at oral argument, raised the issue of constitutional exhaustion. The state then said, you know, yeah, you're right, he did exhaust, and it was too late by that point. Right. And I think we all know that procedural background, so here's my, I'm trying to, I'm having a problem with the logic of Judge Del Boise's conclusion. And don't get me wrong, I think, he doesn't need to hear me say it, and I guess nobody else does either, but he's a remarkably wonderful judge, thoughtful, careful. The opinion he gave you folks on the first go-round in this was so thorough and careful. He couldn't have picked a better judge. Yeah. That's probably exactly the case. Very, very, very superb and thorough job. But I'm still having trouble with his conclusion and your position in the second go-round before him that things that happened after the decisions were made about how to present this at the trial level somehow constitute cause and prejudice. In other words, as a technical matter, if you had a constitutional due process claim about whether that evidence from Dr. Tucker was properly admitted, that should have been presented on direct appeal, shouldn't it? It should have been presented on direct appeal. It was arguably presented on direct appeal, and we had discussions of that. New Jersey court didn't seem to think it was arguably presented on direct appeal. Their impression is it was argued at every point as a point of New Jersey evidence law, not as constitutional due process. We argued before, and if it's necessary to argue again, that the example briefing in the case, the citation of New Jersey cases that discuss the federal constitutional principles, that in fact it could be seen as having been exhausted. When it went back to the state courts, certainly it was presented in terms of state constitutional terms to the three levels of the New Jersey court system. This is following the remand from this court, and the court alternatively reached it on the merits and alternatively declared it to be procedurally defaulted. I think what we come back to is the equities of the situation. Had the state in 1998 said, we don't think this is sufficiently exhausted, I think at that point, given the importance of the claim, the response would have been, if it's not, we're going to do it right now. And going back to the state courts on post-conviction, tried to exhaust the claim, and New Jersey may well have reached it on its merits, but we never had the opportunity. It's kind of been, I'll say, a false sense of security. When the state concedes exhaustion, it doesn't seem necessary to... And that's why Judge Debra Royce used the word ambush. She did use the word ambush. He was clearly troubled by this. It looks like Judge Otto, if I'm saying the gentleman's name correctly, from New Jersey, was also troubled by this. He said, it's very tempting, I understand, but he ultimately rejected your equitable tolling argument and found the thing defaulted. But I'm looking at our decision, our decision last year in Goldblum v. Clem, and it talks in terms of having to show, if I've got the language right, an external impediment preventing counsel from constructing or raising the claim. What external impediment prevented trial counsel from posing this as a constitutional issue? Or on direct appeal. I think if you asked trial counsel, they would tell you they thought they had. They thought they had by citing the state cases that preserved the constitutional claim. I mean, there's no reason not to have, there's no certain tactical reason that one can think of for not raising it. And that's what the New Jersey court said, right? The New Jersey court says it appears that this was a tactical decision to approach it as an evidentiary rule to get the advantage of what was perceived to be perhaps a more stringent standard. With just respect, I don't see the tactical advantage to that at all. And I think when we get back to the idea of the equities of what's at work here, I think it's just, Thorne ambush is a good shorthand example of it, or, you know, knowing which way the wind is blowing when they got to the third circuit to say, oh yeah, you're right, you didn't exhaust your remedies. And then they went back. I mean, it's been five years and three days since I last stood before a different panel on this court trying to get to the merits of a case where I contend an innocent man has been convicted. Why don't you get to the merits of the issue that you initially started to argue when Judge Jordan asked his very important question? When I started and obviously I'll answer any questions anybody has about anything. When I started, I talked about this being critically about time of death and that everything that we complain about and every issue that we raised in the habeas petition checks back to that particular important factor. We start with the most clear and, in a sense, crudest, easiest example of that, which is the testimony of the Morris County Medical Examiner saying that the most likely time of death in this case was 740 in the morning. True, he testified about a range, but here you had the Morris County Medical Examiner telling the jury that the most likely time of death was 740 in the morning. He reached that conclusion based on an absurd, incorrect. He reached that conclusion based on what you call an absurd, incorrect methodology with reference to vitreous potassium, but he also reached that conclusion by virtue of body temperature, lividity, and rigor mortis, and having been at the scene, his observations. The appellate division noted that and adopted those, and we're here on the standard of review. You don't mention much, if anything, about body temperature, rigor, and lividity as also being part of Tucker's testimony and fairly damning and not cross-examined on at all. In reply brief, I tried to address those issues. Those were very broad parameters that were fixed on the time of death, and Dr. Tucker was clear on that, that those were rough estimates of the time, but when it came time to applying this vitreous potassium test, he told the jury the most likely time of death was 740 in the morning. He gave a range with that one, too, right? Pardon me? He gave a range with the vitreous potassium, too. It was a range. It was a range. So it had four things in play, as Judge Barry's just pointed out. He had body temperature killed sometime between 7 and 8 a.m. based on body temperature at 2262. I don't have, obviously he didn't bring it all from New Jersey, but he's much more specific than a range. Much more specific than a range, but he agreed on cross-examination that the body temperature was, he wasn't there until 3 or 4 o'clock in the afternoon. The state's theory is this murder occurred between 7 and 8 a.m. The vitreous potassium test, if correctly applied, would have put the time of death in the middle of about 11 a.m., a time impossible for Mr. Dreher to have committed this murder. There are ambient variations on body temperature, such as what was the temperature in the basement, was there heat on, was there heat off. But he factored all of that in before he came to his conclusion on body temperature. But the only scientific test that he presented to the jury, the only one that wasn't based on a really broad range, and that allowed him to come in at 7.40 a.m., which coincidentally dovetailed exactly with the state's star witness, was his test. And he, to this day, not once have any of his people to my left ever said that what Dr. Tucker did was even remotely defensible. Let's assume for the sake of discussion that we agree with you that, and we agreed with Judge Debevoise, that this wouldn't have made it in as evidence in a federal court. What's the consequence of that here? Are you telling us that Daubert sets forth a constitutional standard? Daubert plainly doesn't. Daubert, Kumho, Tyer, a lot of cases are basically interpretations of Rule 702 of the rules of evidence. However, Judge Debevoise, for example, drew his analysis from barefoot against a stout. And I've cited other cases in the brief in a recent Sixth Circuit case that say erroneous admissions of state court evidence, even though they violate state court rules, may also be so egregious and so harmful that they also offend the due process clause of the 14th Amendment. And there's a line of cases that establish that, and that has to be my position here. I contend that Judge Debevoise, when he applied barefoot, applied it overly rigorously, read it for more than what it stands for. But don't you have to show that Judge Debevoise applied the law contrary to clearly established Supreme Court precedent? What is the clearly established Supreme Court precedent that says that this error with respect to the vitreous potassium is unconstitutional? That's the difficulty with that test, is that if that's read that way, so there has to be a case directly on factual all fours point before anyone can receive habeas corpus relief, then we've really rewritten 2254. What I'm citing the barefoot case for is the constitutional principle that a violation, that the admission of evidence, expert evidence, can in and of itself serve as a violation of the due process. It can, but what precedent says that it does? Isn't that what AEDPA requires? It seems to me that you're making a fairly perhaps persuasive argument for the wrong-headedness of AEDPA, but we have to follow it. We do have to follow it, but I'm not trying to make an argument. That would be a swimming way upstream of us trying to make that argument, and I'm not. What I'm saying is that the principle is, in barefoot, the principle is that on appropriate fact findings and in an appropriate factual setting, the admission of evidence under state court rules or expert evidence under state court rules can violate due process of law. And I draw also on that Eggie case out of the Sixth Circuit, which I supplemented. It's pretty different. Even if it could, don't worry about the red light. Even if it could, Judge Deborah Boyce never went the next step and found that any error would be harmless, given the other means by which Tucker identified the likely time of death. But the appellate division did. They said even if the judge did err, the judge below, in admitting the testimony, this error would be harmless because Tucker arrived at his estimated time of death by looking at four factors, and you know what they are, and Coe's methodology affected only one of the four factors. That's a very important finding, given our standard of review here. I think it's important. But if you look at Judge Deborah Boyce's opinion, and he stops short of finding a due process violation because he feels he's constrained by their opinion. But he didn't discuss the other factors. He does not. He was obviously aware of them, the state was briefing that issue, and those facts for years. Does that finding by the appellate division have some impact, going back to procedural bar, on cause and prejudice? Because the statement is made, as Judge Berry just quoted to you, that this was one of four factors, and in fact they go on and say in that very same passage she was quoting from, moreover, Tucker made it clear that the time of death was only an estimate and that it was stated within a given range of several hours. In other words, they seem to be saying, look, this was one of several things and there was still a broad range. And if the jury concluded, okay, we're going to put it in there in a time frame based on that, that makes him a person who could do it, in other words, undercut his alibi, that was up to them and that's okay. How do you get to prejudice on that point if you've got a state court saying to us, this was one of several factors and we think that, in effect, the error was harmless? Is there a term on harmless error and not prejudice in terms of cause and prejudice? I understand your honest question, if I understand it correctly. It seems to me that those things are related here. In terms of cause and prejudice, I think that if this isn't a case of cause and prejudice, excusable neglect, I can't imagine a stronger case for it. There probably are cases you can imagine, but I think that Judge Denham has looked at the equities and said, hey, this is, again, the word was ambush that he used. I apologize if I'm not making it clear. I'm trying to figure out what the prejudice is of you not getting to argue this if the New Jersey court says it doesn't make a difference. Tucker doesn't, the injuries passed himself doesn't make any difference because there were three other things here and he stated, excuse me, this in a very broad way. And so Mr. Dreher was going to give you the answer. Excuse me. Would the court put ten minutes on Mr. Rockey's clock and then give the state another ten? Thank you. Thank you. If I understand your question now correctly in terms of an academic, I misunderstood it. The district court, and we'll go back to Judge Denham's opinion, never had occasion to apply direct harmless error kind of analysis, harmless constitutional analysis in this case because erroneously from our perspective it's raised unappealed. He felt himself constrained by Barefoot against Estelle from reaching the question of whether this evidence was a due process violation. I mean he said himself clearly that it never would have made it past the gatekeeping function of Daubert. And although Daubert is, I agree, a 702 decision at its core, the whole rationale, raison d'etre of Daubert is let's get reliable evidence to jurors. Let's be sure jurors are getting reliable evidence. And it is wholly consonant with due process. It is exactly what due process requires, to be sure that we get reliable evidence before jurors in cases. So while Daubert is a 702 case, and of course it is, the principle that you take away from Daubert that juries ought to get evidence that's reliable, that pass a minimal gatekeeping, sounds very strongly in due process as well, I think clearly did in this case. And what I think Judge Denham misinterpreted Barefoot was the idea that any expert evidence, no matter how far off the mark, and it doesn't get much further off the mark than the evidence in this case, is immutable, bulletproof. Let me ask you my question this way and see if we can agree. And if not, instruct me and help me out. If for purposes of this discussion you assume that we accept the New Jersey Appellate Division's statement that there were three other reasons for this time-of-death estimate, and it was stated broadly enough that the vitreous potassium testimony really did not prejudice the defendant in a meaningful way, if we accepted that, would you agree that under cause and prejudice you had failed to show prejudice and therefore the Dr. Tucker junk science claims proceed to the court? As I understand your question, I don't mean to be facetious, but you're saying if I lose, I lose. I agree. I mean, if you're saying that there's not some other way that you would be able to say, well, no, you haven't thought of this. Certainly in terms of cumulative error, cumulative constitutional error, that was stated. That would require an initial finding of a constitutional error, perhaps an application of Brecht, which the district court didn't have, didn't get to, and then factoring whether the other constitutional errors together in this produced the real possibility of an unfair and unreliable result. So even if it wasn't enough on its own to constitute prejudice as another brick on the load, so to speak, it tipped the balance. It would take a finding of a due process violation, but once that finding was made, I think in terms of cumulative errors, and there are other issues which I can talk about and I'd like to talk about in this. Before you do that, and I want to hear your arguments on those, but I would ask you to argue those, again, under the AEDPA standard because your briefs, I think, make some arguments that might be more compelling upon de novo review, but, for example, the notes, the destruction of the notes, and whether the hypnotized witness had met prior to January 4th. These were all matters that, if I'm not incorrect, were the basis of state court factual findings. So do we not have to give deference to those state court factual findings? So if you could just keep that in mind as you argue those points. The AEDPA standard clearly requires substantial deference to state court factual findings. Judge Demogorgis, in reviewing the state court record, expressed what I guess I can only call great skepticism about some of those findings and did not take the next step to say he disagreed with those particular findings, which is why we're here. I mean, we talk about the hypnotized witness. This, again, comes back to the time of death. This witness, when he testified when he was first interviewed by police, well, normally you could say that, but we don't know when he was first interviewed by the police. We know there's a little field interview card that says he said he saw Mr. Durant. Have there been findings on that? State court said January 4th, right? January 4th. He read about it in the paper on January 3rd, and he called January 4th, and he was interviewed by Officer Geffel on January 4th. So what evidence of record do you have to show that the determination that January 4th is the date is unreasonable? If you simply look at the exhibit, if you simply look at the document in the appendix at pages 195 to 196, this is the summary that was given to the hypnotist, and it completely contradicts, completely contradicts. But the state court dealt with that. I mean, the appellate division dealt with that, and they found it was careless and it was sloppy and it was all these other things, but, you know, so it's natural. And I really don't know what the standard is. I think it is so clearly erroneous, so off base, so unsupported by the factual record. And if it comes to that, I've asked for a hearing again. Let's have another hearing. Let's explain. Let's explore this. How can we have a two-page summary that is an orphan, that nobody created, that contradicts the witness, that coincidentally winds up setting the time at 915? We have a document in the appendix which it doesn't even take an expert to look at to say is a forgery. And I'm talking about the... F7. I'm talking about F7, especially page 174, 175. But you know what's interesting about F7? And I just picked this up last night. It's one of those little kernels that you think you're going blind, but you actually find something. It's kind of interesting. Yes. At A177, one of the allegedly altered pages, Jekyll places the time that Leck gets in his car at 915 a.m. Now, if you're going to alter a page, they wouldn't want 915 in there. They'd want 935, wouldn't they? It's a little thing, but sometimes little things mean a lot. Let's consider the record a little bit. The officer who probably misspelled her own name on this document had testified that she prepared these documents and these reports all at the Chatham Police Department, all in their equipment, and it was completely contradicted by the expert that the trial court in the state would not allow to testify that not only was there no document of a similar typeface prepared in that office, it was very similar to a lot of documents prepared in the Morris County Prosecutor's Office. And you can look at the change of typeface. It doesn't jump out at you. You can see it. You can see that it changes. And where it changes, it starts to change on the page right after we segue into we're interviewing Mr. Leck, who originally said he had seen a car leaving the driveway where the murder occurred and wound up testifying that it was the defendant's car, Mr. Dreher's car, that testified. He wound up changing his time frame from 915. But it's not changed here. It's not changed here. And if the idea is that they could have done a better job of forging it, then... But there's no finding that it's been forged. And on that regard... Indeed, there's a finding that it wasn't. Okay. In that regard, I've argued that we did not get a full and fair hearing in Morris County, argued that in district court. That was a 12-day hearing with 23 witnesses. And I know it went broader than it was initially intended. It was a 12-day hearing, but we didn't get a chance to put on an expert, or the lawyers who tried it didn't get a chance to put on the expert, who would have said, look, this is a forgery. All right. Well, I guess that makes me want to bring you back to the question that Judge Hardiman raised, which is what's the evidence? I mean, at another point, you talk about jury taint. And you say, this is from your opening brief, no one reading this record can be comfortable that there's been a full and fair exploration. Well, that's sort of what you're saying here. But Edford doesn't say, are you comfortable. Edford says, have you met this very high standard of contrary to or directly against existing Supreme Court precedent and application of facts? I mean, I don't need to quote him again, but it's not a how good do you feel. Because, as you noted, Judge Dembev always said on a couple of cases, I don't not feel great about that, but he stuck to the standard. How does what you're saying here take us to the standard? Again, the standard is simply, was there a full and fair hearing? And the argument has to be, no, there was not, for many of the reasons that I've argued in the brief. Judge Dembev also argued the cross-examination point, the idea of the limitations of the cross-examination of the chief witness, which allowed the state, in summation, to argue to the jury the fact that it was just false, that this witness had changed her response, she had grown up. Oh, that isn't what they argued. She said she had finally grown up. No, it was quote, unquote, questioned. She's finally grown up at the age of 37. Questioned. Then the answer is this. Who knows? That's what it was. But what we do know is that she was anything but stable in the mid-'80s. I've never seen such cross-examination. I've been doing this for a few years. Just about as long as you, Mr. Runke. That witness was cross-examined up the wazoo for days and days, and this is a word I use sometimes that I should. This little bucket, this little credit card thing, you really think could have made a difference? I think it could have in this case. This is not a case of hardly a case of overwhelming evidence. And my final point is that there is a substantial possibility that you're dealing with a case of an innocent person, and I don't know where that fits into that, but I think it does fit into that book. We just can't overlook that. Thank you, Mr. Runke. Mr. McNamara, are you first? Good morning. My name is John McNamara, Jr. I'm an assistant prosecutor with the Boris County Prosecutor's Office. I appreciate the courtesy of the court allowing us to split our own argument. I'm joined by Clementine Monacchio in my office as well. She'll be handling points three and four, the rough notes, and any questions you have regarding Austin Lett. You're not going to deal with Mr. Tucker at all? Dr. Tucker at all? I'll be handling, I think as Ms. Pringle was saying, I spoke to your clerk, I indicated Ms. Monacchio will be handling points three and four. I'm sorry. There is a lot to handle, we admit. But the standard, as Your Honor has pointed out here, is that after years of debate and discussion, Congress enacted the Anti-Terrorism Effective Death Penalty Act that established the standards to strike a balance between the federal court's responsibility to ensure that state court convictions are appropriately obtained pursuant to the federal constitution, but also recognize that the state court's findings and their decisions were entitled to some greater deference than it appeared they had been given leading up to its enactment. And here you have Mr. Dreher being convicted by a jury twice in Morris County, the Appellate Division, in their own words, undertaking an exhaustive review of that trial record, the New Jersey Supreme Court on two separate occasions denying discretionary review, and all deciding that Mr. Dreher in fact received a fair trial and that his conviction was appropriately attained. Were there mistakes made and were there things that perhaps in hindsight should not have been done? Absolutely. Specifically, the concession at the time of the original writ was filed. It's been described as ambush. It's been described as a bait and switch. The state made a mistake. Well, and is that a mistake that Judge Debevoise was correct to say, you made it, you live with it, and it constitutes cause and prejudice? No. I think the issue there was, and the Appellate Division, I think, rightfully recognized it in the context of New Jersey law. Why didn't you cross-appeal that then? Excuse me? Did you guys cross-appeal that point? No. I believe under your precedent, Hall versus Cuyler. But I'm just wondering. I mean, if you thought that was really an issue, why didn't you cross-appeal? Because we thought relying upon Hall versus Cuyler would not be needed, since we were not questioning the judgment of Judge Debevoise, ultimately dismissing the writ. We do think that that particular ground should have been granted regarding Dr. Tucker's due process point, that we did rely, in fact, on Hall versus Cuyler. Why was he wrong on that? I mean, you can waive that argument. So why was he wrong to find that even though, in fact, there was no exhaustion, you conceded the point, and you had to stand by that? Well, I believe, first, that this panel, when it vacated originally and decided it was a mixed petition, decided the state had not waived it, that we had made a concession, and that a concession under 8-per requires an express waiver, and that we did not officially expressly say we made a mistake. We said we made a mistake. We said that's the point to get out to us. And, you know, you're right. Judge O'Neill, in his concurring opinion, said what more could the state have said? I mean, you said you conceded that he had exhausted it. Yes, and I think the other two judges of the panel indicated that an express waiver would require the mistake be brought to our attention, and that we would expressly say, well, we don't care, we want to go forward anyway. And, again, we did make a mistake in concession, and the issue when it's described as ambush or bait and switch, as ambushes go, you know, the enemy got pretty close to the headquarters if we were trying to ambush somebody on this particular issue. It was raised sua sponte by this court after oral argument. So, again, I think, you know, the good faith aspect of it, I think, has to be taken into consideration as to whether or not the state should bear the burden of a mistake placed upon us because, ultimately, the appellant selected the forum to address these particular issues. He foregone review under post-conviction relief in New Jersey to seek habeas relief in the first instance. So the mistake that was made was still made in the context of the forum that he officially chose. Well, what's wrong with Judge Debevoise's reasoning that but for your characterization, innocent mistake, but, nevertheless, a statement upon which Mr. Dreher and his counsel relied, that there was exhaustion and, therefore, he could probably go forward in this forum, but for that, they would have been back in state court and making their argument in a fashion that would not have presented them with a procedural bar. I think, ultimately, the question becomes where does the speculation end and where do you just deal with what actually occurred? And that argument has logical merit. I'm not saying that it's not an argument that has to be viewed, but in the context of this case, it assumes that they would have gone back to seek post-conviction relief, which we now know. Well, they did when they had the chance, and if there's anything you can say about this case, I think you can say that Mr. Dreher's been fighting at every point. I don't get the sense, do you? I mean, you can't really be telling me with a straight face that if they had been told early on, no, it's not exhaustive, they'd have said, well, we're not really interested in that Dr. Tucker argument. I mean, they cross-examined the man for I don't know how long. They may have not been barred by post-conviction relief in New Jersey's rules regarding the five-year time limitation, but the trial court and the appellate division found specifically that it was barred by Rule 322.4 of the New Jersey court rules, indicating that the federal claim should have been raised on direct appeal and if not raised on direct appeal, that in itself is a procedural bar to post-conviction relief. That's an interesting point, and I want to ask you about that. What is the consequence of this court, if any, is there, of this court not pointing that out in 2003? I think that there is a consequence of that, because I do think that at the time it was dismissed as a mixed petition. Again, they were addressing the exhaustion issue. That issue was never squarely presented as to whether it was exhaustive. We indicated we did not think it was exhaustive. It was in fact on post-conviction relief, and then we raised it as an affirmative defense in the context of New Jersey's court rules regarding post-conviction relief. So it may not have been squarely put before, but I don't think it has a consequence now in finding that that particular claim was in fact barred under an independent and adequate state procedural ground. The procedural ground is clear. If you recall in 22-4, the trial court found it specifically. The appellate division affirmed. Now, in their written opinion, they do indicate they also speak about the statute of limitations issue, but they made clear in their decision that they're affirming the trial court on all grounds, and the trial court in post-conviction relief clearly found that the federal claim should have been brought as on direct appeal. And in fact, one of the other claims, as shown by the record below, is that there was an ineffective assistance of appellate counsel raised regarding the failure to raise the federal claim on appeal. And the trial court denied that, saying no, in the context of this case, New Jersey's evidentiary rule regarding Dr. Tucker's testimony, since we are a tri-jurisdiction in criminal cases, that it was a reasonable tactical decision. Okay, speak to Mr. Runke's argument that that's really not a reasonable tactical decision. I mean, I took his point when he was up here to say that. That didn't make any sense. There was no advantage to the defendant in that. Well, that was fully litigated at the post-conviction level, and it was litigated, the appellate division affirmed, that the argument that the state made below and that the trial court adopted was one that this court itself has written on many occasions, that appellate counsel is not expected to make every particular argument. They're allowed to pick and choose arguments that may have more merit than not, not to bury a strong argument amongst a mound of weak ones, is the word of the Supreme Court. Here in New Jersey, again, I'm sorry, we're here in Pennsylvania, but a few miles east of here, the standard of FRI, they argued before the trial court that Dr. Tucker's testimony did not reach the level of FRI. Here, obviously, counsel continues to discuss it in the terms of Daubert, but in New Jersey, FRI is the standard. The appellate division also found, and I think also important, is that it was not a meritorious claim anyway, that the failure to raise a due process claim lost, and that the jury had the opportunity to hear Dr. Tucker be cross-examined about his, quote, idiosyncratic methodology, that the defendant had the right to call a witness if he chose to counter it. They chose not to do so. They attacked Dr. Tucker's methodology, and as a tactic, it may not have been the worst trial tactic, to try to destroy the expert's opinion as a whole by trying to- I'm not sure that the defendant didn't benefit by the savage attack on Dr. Tucker uncrossed. Dr. Tucker's direct examination on the vitreous potassium issue covered all of four transcript pages, just about the same as his direct testimony on body temperature and lividity and rigor mortis. But on cross-examination, you would have thought that vitreous potassium was the sole basis for his conclusion that the prediction, that his prediction of the time of death, and he was shelled on cross-examination, shelled as to his methodology, in my view. I'm not sure, at the end of the day, his credibility wasn't hurt as to the other three. It's a reasonable tactical decision. If you have a witness- I mean, they erected a straw man only to knock it down. I mean, they knew they had him on this methodology. Yes, and they attacked him. And they attacked him and attacked him and attacked him on this methodology. Nor did the state, in this case, give too much weight or credence to vitreous potassium, as you can see from the state's information. It's a passing mention. Let me ask a parenthetical question. When did the method of using vitreous potassium to establish a time of death become junk science, or is it only Dr. Tucker's methodology that is the junk in junk science? There's a footnote that we referenced, a thesis, but the idea of vitreous potassium as being an earmark to find a range of death is still appropriate science. Well, that's my question. I think everybody's using Judge Debra Boyd's- everybody's calling this whole argument the argument on junk science, but I don't know- His interpretation of a chart is being attacked, and that particular chart itself- Is Dr. Koh's methodology considered to be junk science? No. The idea being that Dr. Koh, in fact, was the forensic pathologist who distributed, on behalf of the Department of Justice, the chart to medical examiners and pathology professionals. His chart was actually based upon a study from 1963. Subsequent to that, Dr. Koh's chart has been modified, or it's been suggested in the literature it should be modified. But the state didn't contest, as I understand the record, that Dr. Tucker had taken an entirely novel approach to the vitreous potassium chart that Dr. Koh had come up with and viewed this as some kind of a curve instead of a linear timeline, and that was what, and is what, we continue to hear attacked as without foundation, right? Trial counsel did, in fact, not do that issue. But they did argue to the jury, and more importantly, I think, that the Appellate Division and the state courts found as a finding of fact that the vitreous potassium finding was just a factor amongst many other factors, and that the time of death, no matter how you obtain it, is always within a range, and therefore, that made sure that it was just grist for the jury to know, and if it's grist for the jury to know, their foot is satisfied. I hear you saying, and certainly, as you noted, it got a passing reference in summation, that this wasn't something the state was ever really keen on, even though you're not prepared to acknowledge this junk. It's something that the state's put a lot of distance between itself and Dr. Tucker, am I right? I think the term discretionary decisions has been used many times. In this case, I would like to say that as a discretionary call, the call is up to me. I may have made a different decision, but the state lives with its record and lives with the choices that were made 16, 17 years ago at the time of the trial. However, more fundamentally, it doesn't call into question the verdict of which I'm here discussing because the jury had the chance to hear Savage Cross Examination on this issue. They had the chance to hear Savage Cross Examination and Nan Seaford, and I don't think that we can overlook that Nan Seaford is also a factor in the time of death because she says she's present when it occurred and provides a time frame. At the end of the day, vitreous potassium is an issue that was corroborative of someone else's testimony. It was a fact for a jury to consider along with any other fact, give whatever weight it could or decided to, and that's what due process requires. If you read Barefoot, if you read the Supreme Court's decisions, ultimately about due process, it's whether or not the trust in the jury system that we automatically give in our system is interfered with sometimes. And this is not the type of explosive evidence or evidence that would interfere with the jury making decision, what they normally do, that their will to make appropriate decisions overbore, or somehow that the evidence is so unbelievably unfair that you couldn't expect that a reasonable person could set it aside. For example, like the Bruton context where hearing a confession of a co-defendant is so explosive that you think that it would overcome the normal jury-given take. Vitreous potassium was a minor, minor portion of a trial. Was it best to have Dr. Tucker use a methodology that maybe others had done? Sure, but that's what the jury heard. That by concession, nobody else had done, right? He was not aware of anyone else who had used his methodology. But again, the question then becomes, is the factual finding of the state courts unreasonable? And based upon the fact that it was a factor amongst many other factors, that he himself said that it was a range, that the time of death was a critical component of the state's proof, but it does not exculpate the defendant to the point where it's impossible for him to have committed the murder between 7 and 8 o'clock or whatever the time range the jury may have found. The jury found that Shahandraya killed Gayle Dreyer, killed her in their basement, and that jury inherent in their decision was he had time to do it. And Nancy could provide an opportunity for them to conclude. The time is tight, though. Yes, it is. Yes, it is. Time is tight. It is tight. And again, there was some thought to make this look like someone else did it. The time is not impossible, but Chatham and Newark are very close, and the time was tight. And again, as it dovetails with Mr. Lett's testimony, there are no perfect crimes, and it appears that there was a reason for the defendant to go back, and he chose to do so. And surely here you had no perfect witnesses? No, and all the human foibles that could possibly come forward in a two-house area came forward. Mr. Lett was cross-examined, and Nancy was Shahandraya's mistress and the state's witness. And she was, as Your Honor pointed out, savagely cross-examined. I think the district court was absolutely correct in its ruling, and the state court was absolutely correct that there was just relatively minor limitations on that cross-examination that cannot rise to due process. I would like to address, though, one point regarding the cumulative error point. And just, although I do recognize that an old recourse holding this court has recognized cumulative error as a basis for habeas corpus relief, it's the state's position that that's not a clearly established case from the United States Supreme Court. If you look closely at Taylor v. Kentucky, which was the Supreme Court case cited by the district court, they do talk about cumulative error, but it was in the context of deciding whether or not a particular error was harmless, namely that there was an inappropriate burden of proof instruction, and they indicated because of all these other errors that in and of themselves may not have risen to the level of constitutional error, that they found that they couldn't find that it was harmless error in Taylor v. Kentucky. But our research has not found a single case where under Williams v. Taylor, the idea that the United States Supreme Court has specifically said that cumulative error in and of itself is a basis for habeas corpus relief. I do recognize, however, this court has already done so, but it is the state's position that under 2254d.1 that you may wish to revisit that if you choose to do so. We do raise that in our brief. If there are any other questions regarding any of the points other than point three or four, I would then turn it over to my colleague. Thank you. Good morning, Your Honors. My name is Clementine Manocchio. I'm an assistant prosecutor also in the Morris County Prosecutor's Office, and I'm going to be talking with you and answering your questions regarding the destruction of notes and the pre-hypnotic testimony given by one of the witnesses, Austin Lett. Let me start off by saying that I think ultimately this issue was dealt with extensively at the trial court level. One of the things that occurred, and as Your Honor has indicated, there was a hearing, an evidentiary hearing prior to the second trial that occurred over a period of 11 days with over about 23 witnesses that testified. And they made several findings at a trial court level that the district court agreed with that was not unreasonable. Those findings dealt with whether or not the appellant had made a showing that there was either any material evidence that was contained in any of the notes that had been destroyed by the police prior to the final report, and if there was any bad faith on the part of the police officers in destroying those notes. And the court found that the witnesses that testified, especially Officer Geckel, was credible. There was no indication or facts that were borne out that would suggest that any of the information that was contained in her 13-page draft had been left out by the notes that she may have had. They found that that report accurately and completely reflected the rough notes that she had in conjunction with that draft report. In addition, Captain Ramsey had testified as well that those reports were reviewed by superior officers, maybe not every single one of the reports that they testified at trial, but certainly this report was looked over and checked and verified, and the officers were also directed to verify those reports prior to the destruction of those reports. This was a policy decision that was made, obviously, by the Montana Prosecutor's Office, and there was some discussion about whether or not those policies were somehow in conflict with one another because the Morris County Prosecutor's Office, as the lead agency, had decided to make it a point in this case to destroy any rough notes based upon the voluminous paperwork that was involved, avoiding any of the confusion that might occur, and that would only be done after the reports had been completely checked for accuracy and encompassed everything in their rough notes. I'm just curious. Are you still following that policy in that county? I don't believe that we... I think we still are following that policy, John, that we destroyed the notes in our county, and there's no state law in New Jersey that requires us to retain those notes. The compliance of that would be if there's been a request that's been made by counsel for the notes and they still exist, that we do need to preserve them, or if they do exist, that they should be turned over if they're not completely and accurately put into the reports themselves. The prosecutors' memo to destroy the notes so they don't have to be turned over in discovery, that doesn't really pass the smell test, does it? It may pass the standard for our review, but the timing was very questionable. The timing was right before, I believe, the indictment was... Questionable. It's questionable, yes. But I think that it was made clear by that memorandum that if those notes had not been destroyed, that they would become part of discovery. So I think in that sense, and there was also notes that were... That's the whole point. I mean, okay. Is there a common-sense interpretation of that? I don't want to speak for my colleague, Judge Berry, but is there a common-sense interpretation, hey, you've got ten days to destroy these things? Well, I think... That's the way I would have said about the smell test. I think that the officers didn't interpret it that way. I think most of them, some of them had testified in their hearings that this was a routine practice they did even before the Morris County Prosecutors Office. Some of them did. Instead of a new directive. I guess the real point is, does it rise to the level of a constitutional violation to have a... What it sounds like you're telling us is a continuing county policy to make sure you shred those notes, don't want the defense getting a hold of those. I don't think it rises to the level of a constitutional error. I think the Supreme Court cases on this issue that have dealt with this issue directly is Killian and Arizona v. Youngblood and California v. Trombetta. And in those circumstances, the courts add the element of bad faith on the part of the officers, not just that there's any showing of materiality that that evidence may have suggested, but that where there's only the issue of potentially useful evidence. In other words, where there hasn't been any... The Supreme Court says, in effect, you've got 10 days to get those shredders going. We don't want this coming into the hands of defense counsel. I think ultimately this situation and this aspect of the case could have been handled differently, but the fact that it had gone this way in this particular case does not make it unreasonable in the court's findings on how this occurred and the idea of bad faith. I think that the court evaluated the case in terms of the fact that there obviously were notes that were destroyed, but there was also notes that were kept. There was 164 of those interview cards that were supplied to defense counsel at the trial level. And that evidence, it cut against the argument that this was somehow done in bad faith because there were those additional elements of notes that had been kept, even though some of the notes had previously may have been destroyed. So I think in that sense it doesn't rise to the level of a bad faith showing to make the constitutional argument that this is somehow a violation of Brady material. Even Brady aside, I think Judge Debevoise went off on the Ramos case, which essentially places the burden on the defendant to come forward with evidence showing that these would have been useful to him. And that's a very difficult thing for a defendant to show, isn't it? I think in this context, in some circumstances it might be something difficult for them to show. But I think in this circumstance where he had the opportunity to have a hearing to fully explore the idea if there would have been something that was contained in there, I believe that in this case the judge found that the circumstances that were incorporated in these reports, essentially counsel was indicating that there may have been an interview that occurred on the 3rd or the 7th. The judge found both in the district court and in the trial court level that that just simply did not exist. There were several witnesses that testified, not only police officer witnesses, but other lay witnesses, including neighbors that corroborate, that the first time Austin Lett had spoken with the police was on January 4th as opposed to the 3rd. And I think that the reference in the hypnotic summary regarding the interview that may have occurred on the January 3rd or 7th, the court found that although that document existed, that it was intended not to be an official report, and that it was intended to be vague, and that there was no intent on the police officer's part to withhold information from defense counsel with respect to that issue, and that it was just basically a carelessly drafted document. And the district court agreed with the trial court's findings on that and could not find it to be unreasonable in light of the evidentiary proceeding that occurred before it. Counsel asked this court to rule that there should be an additional evidentiary hearing on that issue. I think in light of the heard hearing that happened initially with respect to the hypnotic testimony on top of and coupled with the additional evidentiary hearing that occurred over 11 days, at that point has met its burden of evidentiary hearings and would be cumulative at best. I don't think there's any additional information that would be segregated out by having another evidentiary hearing on the same issues. How about on the issue of jury taint? Your opponent argues sort of at the end of their brief, but they argue that there was a real problem here with one of the jurors and that the trial judge had a sort of a see no evil, hear no evil approach to it to avoid a mistrial. I guess that's the implication. Why aren't they entitled to a hearing on that? If I may, that's Mr. McNamara's question. If there's any other questions regarding the destruction of notes, I'll handle that. Would you like to go to Mr. McNamara's question? Why don't they get a hearing on that? Well, I think they're not entitled to a hearing because as a matter of state law, they receive the level of hearing that they're entitled to in New Jersey. The public's got no hearing on that. Well, there was a hearing, Judge. There was an interview of a juror by the trial court who made findings. I guess we're having a difference. I don't want to play semantics with you, but when you say there was a hearing, there was an in camera, nobody else was there, discussion between the judge and this juror, and according to the defendant, there was parts of that discussion that were not revealed to anybody and that only came to light later. That's what you're calling a hearing. Well, to the mechanics of it, Judge, the defense counsel confronted to that procedure. I just want to get this straight. When you say there was a hearing, that's what you're talking about? There was a hearing. There was a motion for a new trial and there was argument regarding it. So there was not an evidentiary hearing with cross-examination of the juror, but there was a hearing heard on the motion. Okay, and I understand them to be saying that due process requires that they have had that chance because of this real probability, in their view, of juror taint. So the question I'm putting to you is why are they wrong? Two reasons. I think United States v. Gavilan has indicated in the context of the Fifth Amendment due process clause that due process is not violated by ex parte communication between a judge and a juror. Does that answer the point? They're not complaining that there was an ex parte communication. They're complaining that there was never a genuine investigation of what they allege to have been taint. And I think that's a question of discretion at the trial court level. I don't think that rises to a level of constitutional magnitude. Smith v. Phillips indicates that due process requires that if there is allegations of extraneous influences upon the jury, that the trial court be cognizant of it and the trial court do something about it. As for the discretion as for what that might be, I believe it's a fair reading of the case law that the trial court is vested with tremendous discretion in that regard. In the context of your own opinion, in the supervisory capacity that you follow in the federal system, in United States v. Pertoli, you found that it was not error for the district court to individually interview jurors. And in that case, the trial court interviewed separate jurors separately. And you found no basis to reverse. The judge did not interview the individual jurors here. The rest of the jury, he just interviewed the juror 16. Right. And you've also indicated in your supervisory capacity recognition that sometimes drawing the attention of something to jurors is problematic. Here you have an anonymous note. This would have been a tough one to speak to the other jurors about, to frame the appropriate question, I think, without giving away what the problem was. And I think that's what Judge Smith recognized by immediately taking action. He brought the juror in. The transcript is at, excuse me. This was a very loquacious juror. And if he had interviewed the remainder of the jurors and said, did juror 16 ever say anything to you, that conversation would have gone on for quite a while, I think. She was, I believe, accurately described as talkative. Talkative. As Judge Smith gave his rulings. And I do think, as the trial court recognized, and you have to be recognized, all her comments have to be viewed in the prism of how she viewed herself. Well, the important thing is, the critical comment, in my view here, the one about he had been found guilty before, she said, and off the pages, to the extent you can believe the pages, she had never communicated this to any other juror. That's correct. And Judge Smith. And that was a critical question that she had to answer. And that was asked. He also asked a follow-up question regarding did you tell people. And if you look at the colloquy between the juror and the trial judge, he actually went back to that question after she continued to speak anew about apologizing, about how she thought she had done something wrong. So I do think it was a situation where the trial court addressed it. He addressed it in a manner which had been consented to by the defendant, i.e., a in-camera inquiry. And then he disclosed the record. A motion for a new trial was made. It was denied, and both the state court and the appellate division, and to quote the appellate division, after their exhaustive review of the record, there was a factual finding made by the trial court that there was no taint of other jurors. That's entitled under 2254E to be presumed to be correct. And under EDPA, I think, again, EDPA limits your review to particular areas, and although each judge has its own well of discretion, and, again, five judges may have handled it five different ways, you've indicated in the United States First Counsel that that's what the rule is in the Third Circuit. It's vested in the trial court, and they should do enough. If they don't do enough, then it can be reversible error. Here, however, the question is whether or not due process was violated, and I think the judge and the state court recognized that it was not. Are there any other questions regarding the hearing? Thank you, Mr. McNair. Rebuttal. On the issue of the hearing regarding the juror, it's a hearing. Not only was the defense not allowed to cross-examine the juror, the defense wasn't even advised that there was going to be an interview and wasn't in the room and didn't find out if there had been a jury problem until after the verdict had been returned. But at that time, when defense counsel did find out, it was perfectly amenable to the procedure that had been followed and did not request the opportunity to cross-examine or ask the judge to ask any further questions. No, defense counsel only found out about it well after the verdict. You're talking about the second. Wait a minute, what are we talking about? I have two conversations, the one about the court clerk and the one about the guilty. Yes, there was some side discussion when it first occurred. There certainly was no indication. That's the one I was talking about. And this was a juror who had been told every single day by the trial judges of what to do. Don't read here or speak about this case. If anyone speaks to you about this case, please tell me so we can deal with it. A co-worker says to this juror, what's taking you so long? He was found guilty once before, and she does not bring that to the court's attention. So the idea of crediting her answer that she hasn't spoken to anybody. The only harm of speaking to the other jurors would have been what might have been found out. That's right. It could certainly have been framed in terms of. It's not the only harm, Mr. Harkin. Judge Berry probably pointed out that you can make things worse. The trial judge has to make a judgment about if I get in here and start mucking around, am I going to actually make things worse? I understand that. I understand that completely. The trial judge has pretty big latitude to make on-the-scene judgments about how to handle these things. And as your opponents pointed out, on top of that discretion, we've got this high bar that Edwin puts on you for review. How does that exercise discretion by the district court amount to an Edwin-provided violation? I understand. First of all, we have an adversary system where the defense is supposed to have a say in these matters and make suggestions. Being in those shoes at that moment, I would have asked the question to be posed to the rest of the jurors one at a time. Has juror number 16 discussed with you anything that you haven't heard in the courtroom about this case? That's what you would have done, but the defense counsel didn't do it. Didn't have a chance to. Well, I don't know. This is before the juror was excused. This is before the juror was excused. And even if the juror had been excused, the first thing you do is you walk into court and you say, Your Honor, I'd like to make a record. I want to lodge my objection and take exception to the fact that you didn't give me an opportunity to wardeer. I think in this case, in all these facts, it cried out for more than was done. But let me stick with my rebuttal. But the level of plain error you're saying, that even though it was unobjected by defense counsel, it was so egregious that the trial judge should have been on his own, something has to happen. Okay. But on the other issues that the prosecution has discussed, the core position here on Dr. Tucker is that it's a due process violation. The district court erred by not finding it to be a due process violation. The vitreous potassium test is not per se junk science. The application was junk science. It was the equivalent, as I mentioned in the brief, of looking at a road map saying, Oh, this scale says 100 miles equals one inch. I don't like that. I'll say 100 miles equals a foot. And it's now 30 miles to Los Angeles from New York. It is that level of application. It's such a catch-22 to say, well, you can't prove that anything we destroyed would have helped you. What we did find, the pre-hypnotic interview helped us. There was a field interview card of a witness named Al Jeffers, which is reproduced in the appendix, where at the time he had a conversation with Mr. Tucker, Mr. Dreher, while Mr. Dreher was still in his office, was changed from 915 to 905 to make it barely possible that he could be there. And the final point, the final thing I want to say, has to do with the state's citation of Arizona against Youngblood. There is a certain irony in that citation, or Youngblood against Arizona. It's Arizona against Youngblood. As we all understand, in that case, it was a rape and murder case. It was a death penalty case. The defendant in that case complained that the police had not properly preserved certain physical evidence seized from the victim or recovered from the victim for DNA testing. It was too degraded for DNA testing. It went to the Supreme Court and said, well, we find no bad faith in what the state did here. As the years passed, as Mr. Youngblood sat on death row, the DNA science improved. And ultimately, that evidence was tested, and Mr. Youngblood was determined to be absolutely innocent of that crime and was released from death row. And it's just an instructive tale in the context of this case, and I'll close on that. Thank you. I think I speak for my brethren when I say this case was superbly argued, and just we're very grateful for your help. We will take the case under advisement. Thank you. Thank you.